Wallace O. Leonard, et al. * v. Commissioner. Leonard v. Commissioner
Docket Nos. 26966, 27349, 27357, 27358, 27365, 27366, 27367.
United States Tax Court
1952 Tax Ct. Memo LEXIS 355; 11 T.C.M. (CCH) 12; T.C.M. (RIA) 52001; January 11, 1952
*355 Petitioners' wives reported as their own certain income from joint ventures involving the purchase and sale of war surplus motors. Respondent determined deficiencies against petitioners as a result of attributing the income to them instead of their wives. Held, respondent sustained. The income was produced and earned by the husbands. On a business expense issue involving operation of an airplane, held, for petitioner after application of the Cohan rule. John M. Hudson, Esq., 1170 Penobscot Bldg., Detroit, Mich., for the petitioners. Cyrus A. Neuman, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: These consolidated proceedings involve asserted deficiencies in income tax for the taxable year 1946 against the petitioners, as follows: Docket
No.
Petitioner
Deficiency
26966
Wallace O. Leonard
$ 9,474.74
27349
Harry W. Holt
9,762.51
27357
Rodney B. Pierce
19,394.92
27358
Donald P. Kipp
16,511.61
27365
W. J. Laughlin
14,821.48
27366
Duffield W. Yacks
20,247.48
27367
Frank O. Blunden
15,646.40
The principal issue for determination, which is common to all proceedings, is whether *356 certain income received by the respective wives of the petitioners from three transactions consummated in 1946 involving the purchase and resale of war surplus motors is income taxable to the wives or to the petitioner husbands. A second issue is whether petitioner Pierce is entitled to a claimed deduction of $583.14 as the expense of operating an airplane in connection with his business. A third issue is raised in the case of W. J. Laughlin. It involves dividends amounting to $59.60 received by his wife and reported on her return which respondent treated as income of the husband. Petitioner Laughlin introduced no evidence on this issue and despite disclaimer in his reply brief that the issue has been abandoned, we must decide the issue against petitioner for lack of proof. The resolution of medical deduction issues in several of the proceedings will depend on determination of the main question. A further issue in the cases of petitioners Pierce and Yacks involving the time of dissolution of a partnership was conceded by respondent at the hearing. Findings of Fact A portion of the facts is stipulated and the stipulated facts are so found. Petitioners are individuals who resided *357 in the State of Michigan during the calendar year 1946. Each petitioner filed a separate individual income tax return on the cash basis for that year with the collector of internal revenue for the district of Michigan. The wife of each petitioner also filed a separate individual income tax return for 1946 with the said collector and reported thereon her separate income, including the profits from the three transactions here in question. In 1946 petitioner Kipp was vice president and general manager of Kramer Brothers Freight Lines, Inc., (hereinafter called Kramer), a motor common carrier engaged in transporting general commodities by motor vehicle under certificates issued by the Interstate Commerce Commission. In discharge of his duties as such officer Kipp was required to do a considerable amount of traveling in 1946 and in prior years. In 1946 and at other times material to the issue in these proceedings petitioner Blunden was vice president of Kramer. In prior years he had held other offices with that firm and had also been president of a labor relations association for the trucking industry over 15 states and had held other positions in the trucking industry. In the same *358 year George Ray Dalrymple (not a party to these proceedings, but a party to certain agreements involved herein) also was an officer of Kramer. In 1946 petitioner Laughlin was the district sales manager for the Diamond T. Motor Car Company for Ohio, Indiana, and Michigan. The Diamond T. Company was a manufacturer of motor trucks. Laughlin had had business contacts previously with the other petitioners, except Leonard and Holt. In 1946 petitioner Leonard was the president of Wilson Foundry and Machine Company of Pontiac, Michigan, (hereinafter called Wilson Company). Wilson Company was engaged in the manufacture of automotive engines and the production and machining of engine castings. In 1946 petitioner Holt was vice president and general sales manager of Wilson Company and the man next in line to Leonard. In 1946 petitioners Pierce and Yacks were equal partners in the partnership of Yacks and Pierce which was engaged in the truck and trailer business. Throughout 1946 Pierce did a considerable amount of traveling on partnership business. Yacks was the partner in charge of sales. In 1946 and long prior thereto Yacks and Pierce had had business dealings with Kramer and as a result, *359 Kipp and Blunden were acquainted with and had frequent contacts with Yacks and Pierce. Sometime during the fall of 1945 a representative of the War Assets Administration came to Blunden to ask his advice on the feasibility of adapting surplus army half-track motors to civilian use. Blunden thereupon discussed with Kipp and Dalrymple, his fellow officers, the possibility of purchasing quantities of the surplus motors for the purpose of adaptation and resale. Afterwards the matter also was discussed with Yacks and Pierce and with Laughlin who, as an automotive engineer, was consulted on the technical aspects of adapting the surplus motors to civilian use. All these men knew from their extensive experience in and association with the trucking business that the trucking industry was greatly in need of motors to replace those which had deteriorated during the war and for which replacements were not as yet being manufactured. As a result of these discussions they evolved the idea of forming a syndicate to purchase surplus motors from the War Assets Administration and to resell them to the public for civilian use. In furtherance of this plan, Kipp and Pierce contacted Holt who, in turn, *360 consulted Leonard. Wilson Company was eligible to purchase Government equipment, had adequate credit standing, and had the necessary facilities for reconditioning and adapting the army motors for civilian use. The Wilson Company was interested in any business that would produce a profit and after discussion between Leonard and the chairman of the Wilson Company board of directors the Company through its appropriate officers determined to join the venture. On or about November 27, 1945, the petitioners together with Dalrymple (hereinafter referred to collectively as Kipp and Pierce Associates) entered into an agreement to join together for the purchase from Wilson Company of some 400 surplus motors and to resell them. At or about the same time Kipp and Pierce Associates entered into an agreement of purchase and sale with the Wilson Company under which the Wilson Company agreed to sell and Kipp and Pierce Associates agreed to buy the 400 motors. The motors described in the 1945 agreements were ordered from the War Assets Administration by Wilson Company on November 21, 1945. They had been located by one Broadwell, a "finder", whom Blunden had contacted originally and to whom the *361 Associates arranged to pay a finder's fee. The motors were resold by Kipp and Pierce Associates early in 1946 to various persons though so-called agents who were paid a commission on the sales. Several employees of Kramer in various cities were active in making important sales of motors. The office facilities of the Yacks and Pierce partnership were used in carrying out the transactions. The motors were shipped by the Wilson Company to the purchasers upon orders or shipping instructions placed by Kipp and Pierce Associates. The Wilson Company invoiced the Associates for the cost of the motors plus service, storage, and shipping charges, and such invoices were paid by Kipp and Pierce Associates. The sales prices of the motors were paid by the ultimate purchasers to Kipp and Pierce Associates. The Yacks and Pierce partnership was paid by Kipp and Pierce Associates for the expenses incurred for the use of its offices. The total proceeds received by Kipp and Pierce Associates for the sale of such motors amounted to $206,388.25, and the net profits to the Associates on the sales amounted to $102,890.50. This net profit was distributed to the petitioners and Dalrymple in accordance with *362 their agreement of November 1945; i.e., 8.3 per cent each to Leonard and Holt and 13.9 per cent to each of the others. In connection with the above described venture the Yacks and Pierce partnership acted as sales agent for the Associates. A great many circular letters were mailed in January 1946 from the partnership office to persons in the trucking industry announcing the availability of the motors through that office. The response to these letters was "terrific". The worth of the motors became generally known through installations made in Kramer trucks and many sales were made through employees of Kramer in various cities. Word was spread about by the Associates that a commission of $50 per motor would be paid to anyone who produced a sale. This fact together with the general utility of the motors resulted in their rapid sale with very little further direct sales activity or effort on the part of Kipp and Pierce Associates. Additional surplus motors were ordered by the Wilson Company on January 15, 1946, their availability having been brought to the attention of Kipp or Pierce by the finder Broadwell, and through Kipp or Pierce to the attention of Leonard and Holt. A few days *363 prior to March 31, 1946 the Wilson Company received advice that the motors had been shipped and on March 29, 1946, petitioners' wives, together with Dalrymple signed an agreement joining together in a common enterprise under the name of Michigan Accessories Company to purchase 150 motors from the Wilson Company and to resell them. The agreement provided that each of the parties was to contribute $3,000 in cash as capital for the enterprise and that after payment of all costs and expenses the net profits should be distributed among the parties to the agreement in the same proportion as the husbands' agreement had provided; i.e., 8.3 per cent to Ruth B. Holt; 8.3 per cent to Marjorie W. Leonard; and 13.9 per cent to Dalyrmple and each of the other wives. Michigan Accessories Company, (hereinafter sometimes called the first wives' venture), was formed after several of the petitioners had consulted a tax lawyer. The wives were advised to join by their husbands who thought it was an opportunity for the wives to gain independent income. Possible tax consequences were also considered. Each wife paid over the required $3,000 to Michigan Accessories Company. Five of the wives acquired their *364 capital contributions by outright gifts from their husbands; Marjorie W. Leonard acquired her $3,000 by loan from her husband, (repaid May 1, 1946); and Ruth B. Holt paid in her $3,000 from her own independent funds. The total sum of $24,000 corresponding to the contribution of $3,000 made by each party was deposited in a special bank account maintained by Michigan Accessories Company. This amount, together with other sums deposited in the account, was disbursed or withdrawn on checks signed in the name of Michigan Accessories Company by two of the wives designated in the agreement to represent all parties thereto. Also, on March 29, 1946, the Wilson Company agreed to sell and the first wives' venture agreed to buy 150 surplus motors purchased by Wilson Company from Reconstruction Finance Corporation. The Wilson Company agreed to perform at reasonable compensation all necessary services to place the motors in condition for civilian use. The agreement also provided that from the proceeds of sale of the motors there should first be paid to Wilson Company the cost to it of such motors, including the service charges, and, in addition, 10 per cent of the net profits realized from the *365 resale after deducting all reasonable and necessary expenses incident to the resale. It was further provided in the proceeds from the sale of any of the motors should be deposited by Michigan Accessories Company in a separate bank account on which the Wilson Company should have a lien for any sum due it under the agreement. The motors were sold to the public in much the same way that Kipp and Pierce Associates had previously sold their motors. The Michigan Accessories Company paid a finder's fee to Broadwell. Little direct sales effort was required primarily because the market had been established by the husbands' venture. Commissions were paid to so-called agents by the first wives' venture for arranging the sale of motors. These persons were not employed or appointed expressly to make sales. The office facilities of the Yacks and Pierce partnership were again utilized in making sales and the first wives' venture reimbursed the partnership for its expenses. Orders were sent in to the office of the partnership and a girl in that office took care of their receipt and the placing of shipping instructions with Wilson Company. The sales price of the motors was paid by the purchasers *366 to the first wives' venture which, in turn, was invoiced by Wilson Company for its costs pursuant to its agreement with the venture. On June 3, 1946, the wives together with Dalrymple embarked on a second venture under the name of Wayne Materials Company, (hereinafter sometimes called the second wives' venture). This venture was substantially similar in all respects to the first wives' venture. Its purpose was to buy from Wilson Company for resale, 310 surplus motors. The second wives' venture opened a separate bank account, but in this instance the agreement did not require any capital contribution from the parties. The percentages allocated to the wives were the same as those in the first venture. The sales procedure was the same and the agreement entered into with the Wilson Company for the purchase of the motors was in all essentials similar to the agreement made between Wilson Company and the first wives' venture. On July 11, 1946, the wives and Dalrymple entered into an agreement similar in most respects to the preceding ventures. This association was called the New Baltimore Equipment Company, (hereinafter sometimes called the third wives' venture). The third wives' venture *367 agreed to buy 1,000 surplus motors from the Wilson Company on substantially the same terms as the previous wives' ventures had bought surplus motors from Wilson Company. These motors together with 38 motors owned by the second wives' venture were sold in one block by the third wives' venture to the Sears Roebuck Company. This sale was negotiated by petitioner Pierce through an intermediary salesman or agent known only by the name of "Pete" who was connected with the Allied Machinery Company in Indiana. The sale and all of its details as to price, etc., were arranged as a result of discussions between Pierce and "Pete". "Pete's" connection, if any, with Sears Roebuck is not disclosed. On July 11, 1946, a purchase order for 1,000 motors was received from Sears Roebuck. It was made out to New Baltimore Equipment Company. On the same day, the third wives' venture was formed. The instructions to Wilson Company relative to the delivery of the motors in specific quantities to particular branches of Sears Roebuck, and the other clerical details were again handled by the Yacks and Pierce partnership office. During the calendar year 1946, Marjorie W. Leonard and Ruth B. Holt received as their *368 respective shares of the profits from the three wives' ventures a total of $15,359.52 each. The total amount received in 1946 by the wives of the other five petitioners was $25,599.22 each. These funds were deposited by each of the wives in her separate bank account and none of the funds were expended by any of the wives for the benefit of any of the husbands. Other than as outlined above in connection with Kipp and Pierce Associates, all the petitioners did not join together in any other ventures to buy or sell surplus war materials. None of the petitioners contributed any capital other than by way of gift or loan as outlined above to the three wives' ventures and none of the profits from those ventures were paid over to the petitioners. Petitioners did not act on behalf of their wives in connection with the wives' ventures. Only two or three of the wives had had any previous business experience prior to 1946. The record does not show that any of the wives performed services in connection with their ventures other than to sign checks through designated representatives. Wilson Company did not require the wives to contribute any capital and capital was not an important factor *369 in any of the wives' ventures. In the case of each petitioner respondent determined that the income received by the wife from the three wives' ventures should have been reported as the income of the petitioner. Petitioner Pierce claimed a deduction for the year 1946 of $583.14 as an expense incurred in the operation of a private airplane in connection with his business. The airplane was used during 1946 partly for business purposes. The amount claimed represents 80 per cent of the alleged total airplane expenses of $728.92 This was an estimate. Petitioner Pierce incurred expenditures of $400 for the use of the airplane in connection with his business in 1946. Ultimate Finding The income from the three wives' ventures was earned and produced by the husbands and was income of the husbands. Opinion The main question here is the sometimes troublesome one of "Whose income?". Are the profits of the three wives' ventures to be taxed to petitioners or to petitioners' wives? Respondent, relying on the broad principles expressed in such cases as , and , contends that petitioners, rather than their *370 wives, earned the income and hence that petitioners should be taxable on it. On the other hand, petitioners contend that their wives earned, realized, and received the profits and accordingly should be the taxpayers. We agree with respondent. It is often said that taxation is an intensely practical matter, concerned with realities. Looked at in that light the facts here lead us to but one conclusion - the husbands produced the income, the wives but collected it. It was the husbands' wide experience, knowledge, contacts, and long association with the trucking and automotive business that enabled them in the first instance to recognize and take advantage of the civilian demand for war surplus motors. The husbands' venture, Kipp and Pierce Associates, utilizing this experience and know-how, developed the mechanics and set the pattern for profitably finding, adapting, and reselling the motors. That venture was highly successful. Not long afterwards the "finder", Broadwell, reported to the husbands that more motors were available. Convinced that the opportunity for profits still existed and knowing that the market was still there, as well as the facilities for adapting and reselling *371 the motors, the husbands consulted a tax attorney with a view to giving their wives an opportunity to make some money. The agreement constituting the first wives' venture resulted. The purchase and resale of the motors followed the same pattern as the husbands' venture. The market found by the husbands was again tapped. The same sales channels were used. Orders were again handled by the office of a partnership composed of two of the husbands. The principal salesmen were again employees of Kramer, the firm of which two other husbands were officers, and, again the motors were put in shape by Wilson Company, of which yet another two of the husbands were officers. Significantly, too, the profit split followed the same unequal pattern as the division in the husbands' enterprise. Nothing was changed, except time and the names appearing on the agreements. Petitioners point out that the wives each put $3,000 into the first wives' venture and attach importance to it. However, we find nothing in the record to indicate that capital was of importance in producing the income and have found as a fact that capital was not important. The motors, in the first place, were purchased by Wilson Company *372 from the Governmental agencies. There was nothing in the Wilson Company agreement with the wives requiring them to start off with money in the bank. They were simply to pay Wilson Company for the motors from the proceeds of the sale of any of the motors and Wilson Company, for its protection, had a lien on the special bank account into which the wives agreed to place the sales proceeds. Thus it was Wilson Company credit and capital that put the venture in business in the first instance. It did not depend on the wives' credit. The agreements for the second and third wives' ventures required no capital contribution at all. The relative unimportance of the wives' capital contribution is further shown by the fact that with an initial capital of $24,000, profits of approximately $200,000 were realized within the year. As far as services are concerned, the wives contributed little, if anything, other than to sign the agreements, open the bank accounts, and through their designated representatives, sign checks for the expenses. None of the wives had any business experience helpful to the ventures. There is nothing to establish that they ever met together for any purpose in connection with *373 the business. None of the wives was called to testify and we have only the testimony of the husbands concerning the ventures. It is reasonable to assume this was because only the husbands really knew anything about the business. The insignificance of the part played by the wives in these transactions is forcefully shown by a glance at the third venture which involved the sale of 1,000 motors, more than twice the total number handled by the preceding ventures, to a single customer. This sale was arranged virtually alone by petitioner Pierce through discussions with a person whose connection with Sears Roebuck was not disclosed. All of the details were worked out before the wives were brought into the picture at all. Then, on the day the transaction was to be closed, the wives signed the necessary papers. So far as the record discloses, that is all they had to do with the sale. There is no evidence that they even met together to discuss the matter before sitting down to affix their signatures. The husbands planted the seed, nurtured the tree, and then shook the fruit into the laps of their wives. We have carefully studied the numerous cases cited by petitioners to sustain their *374 contention; but the issue here is one to be determined solely by the ultimate conclusion to be drawn from the facts in this case, and we do not think a detailed analysis of the facts in other cases, (none of which is on all fours with this one) would be helpful. We conclude and hold that respondent was correct in attributing the income in question to petitioners. Our finding of fact on the airplane expense issue disposes of that issue. While the evidence is of a general nature we think the rule of , is properly applicable and that petitioner Pierce should be allowed to deduct the amount of $400 as a business expense. As stated above, respondent's determination on the third issue involving dividends of $59.60 is sustained in the case of petitioner Laughlin. Decision will be entered for the Respondent in Docket Nos. 26966; 27349; 27358; 27365; 27367; and under Rule 50 in Docket Nos. 27357; 27366. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Harry W. Holt, Rodney B. Pierce; Donald P. Kipp; W. J. Laughlin; Duffield W. Yacks; and Frank O. Blunden.↩